VT INVESTORS, et al., Plaintiffs,

v.

R & D FUNDING CORP., et al., Defendants.

Civ. A. No. 89–490.

United States District Court,
D. New Jersey.

Feb. 23, 1990.

As Amended Feb. 27, 1990.

Michael A. Saffer, Klein, Chapman, Greenberg, Henkoff & Siegel, Clifton, N.J., for plaintiffs.

Thomas Kavaler, Cahill, Gordon & Reindez, New York City, for defendants.

WOLIN, District Judge.

This purported securities fraud action requires the Court to retraverse familiar terrain. Before the Court is defendants' motion to dismiss plaintiffs' amended complaint pursuant to Rules 12(b)(1), 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. The Court is intimately familiar with this litigation having heard a similar motion by the defendants on July 12, 1989 requesting dismissal of plaintiffs' original complaint. At that time, rather than dismiss plaintiffs' complaint for its total insufficiency, the Court allowed the plaintiffs 30 days to amend the deficiencies in conformance with the "road map" provided in the defendants' memorandum of law.

A thorough review of plaintiffs' amended complaint reveals that the amendments fail to remedy the original deficiencies. Therefore the plaintiffs' federal claims will be dismissed for failure to state a claim upon which relief can be granted. The Court will dismiss plaintiffs' state law claims for lack of jurisdiction.

## I. BACKGROUND

Plaintiffs are a New Jersey general partnership known as VT Investors ("VTI") and several individual investors of Vision-Tech, Inc. ("VisionTech"), a publicly traded corporation engaged in the business of manufacturing and distributing specialty and commodity contact lenses. The investors claim that they purchased VisionTech securities between 1986 and 1988 and have sustained severe losses from their investment. On February 3, 1989 plaintiffs filed a complaint for violation of the federal securities and racketeering laws, violation of the New Jersey "blue sky" laws, breach of contract, breach of fiduciary duty and common law fraud. Named as defendants are various officers and directors of Vision-Tech, specifically John Keenan, David Gamsey, Patrick Burns and Louis Gerken; R & D Funding Corp. ("R & D"), a corporate investor alleged to have been VisionTech's majority shareholder; Prudential–Bache Securities, Inc. ("Pru–Bache"), a corporate affiliate of R & D; and the accounting firm of Arthur Andersen & Co. ("Arthur Andersen"). The thrust of the complaint is that the various defendants fraudulently induced plaintiffs to purchase or retain certain securities by making affirmative material misrepresentations and omissions of fact.

In lieu of answer, on April 17, 1989 defendants filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12. The Court heard the motion on July 12, 1989, acknowledged the legal insufficiency of plaintiffs' complaint, and provided plaintiffs with 30 days to amend the complaint to allege legally sufficient and cognizable claims. Plaintiffs were admonished that should their amendments fail to correct the deficiencies in the complaint, a future motion to dismiss would, if granted, result in a dismissal with prejudice. Tr. 5–8 to 5–11.

Prior to the July 12, 1989 hearing, the Court thoroughly reviewed the plaintiffs' original complaint and found that, among other deficiencies, the complaint alleged inapplicable sections of the securities laws, misperceived many of the security laws and failed to properly allege the jurisdiction of the Court. At the hearing, the Court stated that as a whole, the complaint failed to "pass muster." Tr. 3–23 to 3–24. Expressing agreement with the Court's assessment of the complaint, plaintiffs' attorney stated that "he [understood] the deficiencies set forth in the complaint." Tr. at 4–23 to 4–24.

After that hearing all defendants, except Arthur Andersen filed a motion to sanction the plaintiffs under Fed.R.Civ.P. 11. Arthur Andersen joined the sanction motion

by letter.[1]

On September 18, 1989 the Court awarded defendants a total sanction of Ten Thousand Dollars ($10,000.00). By written opinion, the Court stated that sanctions were warranted because "the extensive and serious deficiencies in plaintiffs' complaint rise to the level of wasting the defendants' and the Court's resources." Slip Op. at 5.

The Court now faces another motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Once again the Court must use valuable resources to instruct plaintiffs' counsel on certain basic requirements of pleading and fundamental concepts of fraud under the federal securities laws. This time, however, the Court will not allow plaintiffs to amend their complaint. Plaintiffs' amendments fail to cure the deficiencies of the original complaint. Therefore, in accordance with the Court's previous directives in this matter, plaintiffs' federal claims will be dismissed with prejudice.

## II. DISCUSSION

### A. *Jurisdiction*

As a threshold matter the Court must address plaintiffs' allegations of subject matter jurisdiction. A basic requirement of pleading is that the jurisdiction of a federal court must appear on the face of the complaint. *Schultz v. Cally*, 528 F.2d 470, 474 (3d Cir.1975).

Plaintiffs allege in their complaint that jurisdiction is founded upon: (a) the existence of federal questions construing various sections of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Rules issued thereunder; (b) diversity of citizenship pursuant to 28 U.S.C. § 1332; and (c) the pendent jurisdiction of the federal courts. Complt., ¶ 1.

### 1. *Diversity Jurisdiction*

Diversity jurisdiction under 28 U.S.C. § 1332 is available only if the citizenship of all plaintiffs is diverse from that of all defendants. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Hence, "[a]llegations of the citizenship of *all* parties to the lawsuit must appear in the complaint." *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 478 (3d Cir.1979) (emphasis added).

A corporation is a citizen of the state in which it is incorporated and where it has its principal place of business. 28 U.S.C. § 1332(c) (1982). The amended complaint is defective for failing to allege the states of incorporation of the corporate defendants. Complt., ¶¶ 10, 15. *Randazzo v. Eagle–Picher Indus. Inc.,* 117 F.R.D. 557, 558 (E.D.Pa.1987).

Plaintiffs' original complaint did not properly allege specific federal statutes for a jurisdictional basis and failed to allege the citizenship of all the parties for the purpose of establishing diversity jurisdiction. Slip Op. at 5. When plaintiffs attempted to remedy the deficiencies of the original complaint by providing supplemental information to the Court in their papers, the Court informed counsel, "[i]t's not sufficient for you to say in a brief and supply information that should have been in the complaint...." Tr. 3–24 to 4–1.

Once again plaintiffs' counsel attempt to remedy jurisdictional deficiencies of the complaint by providing additional information in their papers. Pltf.Mem., 1–2. At this juncture there is little reason for the Court to be receptive to such maneuvers. Moreover, because the Court specifically instructed counsel on this very point, the Court is not persuaded by counsel's equity argument. Tr. 8–18 to 8–24. Counsel received instruction on the jurisdictional deficiencies of the original complaint. To require diversity to be properly alleged is not a hypertechnicality and failure to remedy an insufficiency of such a fundamental nature must result in dismissal as to all counts predicated upon diversity jurisdiction.

---

**1.** Plaintiffs subsequently filed a voluntary dismissal with prejudice as to defendant Arthur Andersen on October 17, 1989.

## 2. Federal Question Jurisdiction

■ Although defendants argue that plaintiffs have not properly invoked federal question jurisdiction because "not one of the plaintiffs' purported federal claims (Counts V through XI) is legally sufficient," (Def.Mem., 3), legal insufficiency is not the standard applicable to a motion to dismiss for lack of subject matter jurisdiction. The Supreme Court has declared that such a dismissal is justified "only if that claim were so attenuated and unsubstantial as to be absolutely devoid of merit or frivolous." *Baker v. Carr*, 369 U.S. 186, 199, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962) (citations omitted). Applying that standard, the Court finds that plaintiffs' claims are not so absolutely devoid of merit or frivolous to warrant dismissal for lack of subject matter jurisdiction.

Defendants have also requested that plaintiffs' complaint be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Legal insufficiency is the standard for dismissal under Rule 12(b)(6). "[I]f as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams,* —— U.S. ——, ——, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). Thus failure to state a proper cause of action calls for a judgment on the merits, not for dismissal for want of jurisdiction. *Baker,* 369 U.S. at 200, 82 S.Ct. at 700.

Accordingly, the Court will next determine the legal sufficiency of each count of the Amended Complaint that alleges a violation of federal law.

## B. Legal Sufficiency of Counts Five Through Eleven [2]

### 1. Count Five

■ In Count Five plaintiff VTI alleges a violation of Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5") [3] and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j ("§ 10(b)") [4] in connection with "VTI's purchase of the New Warrants during February 3, 1988...." Complt., ¶¶ 71, 76.[5] Plaintiff contends that

---

**2.** The Court need not consider the legal sufficiency of Count Ten which purports to assert liability under a theory of respondeat superior, because that count does not assert any violations of a federal statute. Were a statute mentioned, however, the count would fail as a matter of law under the Third Circuit's declaration that, "principles of agency, i.e. *respondeat superior*, are inappropriate to impose secondary liability in a securities violation case." *Rochez Brothers, Inc. v. Rhoades (Rochez II),* 527 F.2d 880, 884 (3d Cir.1975).

**3.** Securities and Exchange Commission Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1989).

**4.** Section 10(b) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1988).

**5.** The claimed purchase of the "New" Warrants refers to the fact that VTI was permitted to exchange warrants for the purchase of Vision-Tech stock that it had held since January, 1987, exercisable at $1.56 per share (the "Old Warrants") for warrants exercisable at $.23 per share (the "New Warrants") Complt., ¶¶ 26, 41(e)-(f), 45, 48, 51(d), 53, 71.

each defendant made fraudulent statements, with knowledge of falsity or with reckless disregard for their truth, concerning the value of VisionTech's stock and that plaintiffs relied to their detriment upon those material misrepresentations in making the decision to purchase the New Warrants. Complt., ¶ 73.

The Court has many difficulties with plaintiffs' claim, not the least of which is parsing the claim from the talismanic-phrase littered complaint. Once parsed, however, plaintiffs' claim is clearly untenable.

In this jurisdiction the significant elements of a Rule 10b–5 violation are (1) a material misrepresentation; (2) a purchase or sale of a security; (3) scienter on the part of the defendant who made the misrepresentation; and (4) that the misrepresentation be made "in connection with" the purchase or sale of a security. *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 942 (3d Cir.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Ketchum v. Green*, 557 F.2d 1022, 1025 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977).

For purposes of a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court must accept all well pleaded allegations as true and view them in the light most favorable to plaintiff. *Rogin v. Bensalem Township*, 616 F.2d 680, 685 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). The complaint cannot be dismissed unless plaintiffs can prove no set of facts entitling them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Turning to Count Five, specifically paragraphs 73, 75 and 76 of the Amended Complaint, the plaintiffs make a general allegation of fraudulent conduct as to all named defendants referring to statements recited in paragraphs 34, 41, 42, 44, 45, and 47. Those paragraphs, however, contain no specific allegation of wrongdoing with respect to R & D or Pru–Bache. Rather, each of the cited paragraphs refers to statements made only by defendants Gerken, Keenan or Gamsey, past members of VisionTech's Board of Directors. The Court notes that VisionTech is not a defendant in this case. Thus, as to defendants R & D and Pru–Bache, plaintiffs have not supplied the necessary causal connection between the defendants' conduct and plaintiffs' injury. *Cf. Angelastro*, 764 F.2d at 943 (there must be some causal connection between alleged fraud and purchase or sale of securities; injury suffered must result from the deceptive practices touching the purchase or sale of securities).

▮ The plaintiffs' failure to allege loss causation with respect to defendants R & D and Pru–Bache is not the only pleading omission. An element of a Rule 10b–5 violation requires that the fraudulent conduct be "in connection with" the purchase or sale of a security. Here, assuming arguendo that the exchange of Old Warrants for New Warrants constitutes a sale because value was given,[6] such contemporaneous conduct is not present. The alleged misrepresentations cited by plaintiffs were made by defendants in connection with VTI's possible guarantee of the Valley Loan. Complt., ¶¶ 41–48. The exchange of warrants was incidental to the primary transaction, which was securing the loan guarantee. Thus, the narrow issue before the Court in this count is whether the relationship between the security purchase and the transaction affected by the misrepresentations is close enough to satisfy the "in connection with" language of § 10(b).

The Court is not without guidance in discerning the parameters of the "in connection with" language. In *Angelastro*, the Third Circuit provided a cogent discussion of that language under § 10(b). 764 F.2d at 942. The Court noted first that the purpose underlying § 10(b) and the rules adopted under it is to insure that investors obtain disclosure of material facts in con-

---

**6.** VT Investors claim they guaranteed the "Valley Loan" loan in return for the warrant exchange. Complt., ¶¶ 41–45.

nection with their investment decisions regarding the purchase or sale of securities. Secondly, the Court noted that Rule 10b–5 claims typically involve alleged misrepresentations with respect to the merits of a particular security. *Angelastro,* 764 F.2d at 942. In such cases the connection between the purchase or sale and the fraud is readily apparent, thus the "in connection with" requirement is easily satisfied without lengthy analysis.

Discussing other claims held valid under Rule 10b–5, the Court cited those which include allegations of churning[7], *see Costello v. Oppenheimer & Co.,* 711 F.2d 1361, 1368 (7th Cir.1983); a broker's failure to explain the risks of trading on margin, *see Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 619 (9th Cir.1981); and fraud involving the trading process, rather than the investment value of a particular security, *see Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). *Angelastro,* 764 F.2d at 943. In the foregoing cases, the courts construed the "in connection with" language to encompass situations where the alleged fraud occurs in the course of dealing in securities. *See also, Jaksich v. Thomson McKinnon Securities, Inc.,* 582 F.Supp. 485, 494 (S.D.N.Y.1984) (fraud directly related to the trading process meets the "in connection with" requirement).

Mindful of the Supreme Court's declaration that § 10(b) must be read "flexibly, not technically and restrictively,"[8] Third Circuit jurisprudence has held that the "in connection with" language requires some causal link between the alleged misrepresentation and the harm incurred when a security is purchased or sold. *Angelastro,* 764 F.2d at 944; *Ketchum,* 557 F.2d at 1028; *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194 (3d Cir.1976). Applying those principles to the facts presented, the *Angelastro* court found that although the brokers' fraudulent concealment of credit terms of a margin account did not affect the investment value of a particular security, it did affect the course of dealing in securities, and thus, the causal connection was sufficient to state a claim under Rule 10b–5. 764 F.2d at 944.

Like *Angelastro,* the misrepresentations at issue here did not affect the investment value of a particular security. The Old Warrants held by VTI were exercisable at $1.56 per share, the New Warrants at $.23 per share. Plaintiffs' complaint does not contain a single averment relating to the value of the warrants, indeed, the disputed misrepresentations all relate to VisionTech's health as a corporation. For example, paragraph 34 states that Gerken assured Oolie "that the decline in stock value was attributable to former founder/stockholders ... selling their stock without just cause and the business community's misunderstanding of Allergan's June 24, 1987 election to permit an option to purchase 2,804,000 shares of Visiontech at $.25 per share to lapse; [and the prospect of] Visiontech's stock rising, in the near future, to $10.00 per share was not unreasonable."[9] No one misrepresented the value of the warrants, in fact the plaintiffs got exactly what they asked for, new

---

7. Churning occurs when a securities broker buys and sells securities without regard to the customer's investment objectives, in order to generate commissions. *Angelastro,* 764 F.2d at 943, n. 6 (citations omitted).

8. *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971).

9. Similarly, ¶ 41 merely recites business decisions of Visiontech involving the selling of assets and resolution to ask VTI to guarantee the "Valley Loan"; ¶ 42 alleges a representation in regard to the market value of VisionTech's inventory; ¶ 44 indicates that VisionTech's Busi-

ness Plan portrayed the company as a very solvent but illiquid company having a considerable net worth in excess of $2,900,000 but poor cash flow; ¶ 45 represents purported concessions to Oolie, including the "R & D Guarantee," the "Board Resolution," and the promise that VTI would receive 3,000,000 new warrants exercisable at approximately $.23 per share for five (5) years in lieu of the Old Warrants; ¶ 47 alleges that "Keenan sent to VTI and Oolie cash flow projections for VTI (sic) that represented that a positive cash flow of $58,106 would commence in June 1988 and increase substantially thereafter.

warrants exercisable at a lower price. Because the New Warrants reflected a $1.33/share decrease in price, receipt of the New Warrants would only either improve VTI's position in VisionTech or maintain the status quo. Thus it cannot be inferred that VTI was worse off having the New Warrants than it would have been had it held on to the old ones.

Nor were there misrepresentations made in the course of dealing in securities. The alleged misrepresentations of Gerken, Keenan and Gamsey were made in the course of convincing plaintiff VTI to guarantee the Valley Loan. Complt., ¶¶ 41(e), 48. Although the transaction involving the commercial loan guarantee did eventually encompass communication about the warrants, the primary course of dealing was a commercial transaction, not a securities transaction. The New Warrants were provided merely as a "concession" and "as a result of Sam Oolie's request." Complt., ¶¶ 43, 45(c). Moreover, the exchange of warrants did not represent the sole consideration for the guarantee of the loan, but only one of many promises made to VTI to secure the loan guarantee.[10]

Plaintiffs argue that the "principal misrepresentations made ... concerned the value of VisionTech's stock itself and constituted the fraudulent foundation for the defendants offering to and VTI accepting the New Warrants.... As a proximate result of the fraud, the New Warrants were rendered worthless and VTI sustained damages." Pltf.Mem. at 8–9 (citations and emphasis omitted). Notwithstanding factual inaccuracies, the essence of plaintiffs' claim is that "but for" the alleged misrepresentations, VTI would not have guaranteed the Valley loan, and that if they had not done so, there would have been no exchange of warrants. Such "but

for" causation is insufficient to satisfy the requirement that losses be causally related to the defendants' wrongful acts. *Cf. Sharp v. Coopers & Lybrand*, 649 F.2d 175, 186 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (plaintiff in a Rule 10b–5 action should not recover damages when the defendant's wrongful action had no relationship to the plaintiff's loss). "But for" causation merely establishes "transaction causation,"[11] not the "loss causation"[12] necessary for a legally sufficient claim under § 10(b) and Rule 10b–5. *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *see also Hartman v. Blinder*, 687 F.Supp. 938, 943–44 (D.N.J.1987) (plaintiff must affirmatively plead "loss" causation—a direct causal link between fraud and securities loss); *Angelastro*, 764 F.2d at 944 (plaintiff must establish some causal connection between alleged misrepresentation and harm incurred when a security is purchased or sold).

Although the misrepresentations at issue may have touched upon the reason VTI chose to guarantee the Valley Loan and also requested the New Warrants, the causation requirement in a Rule 10b–5 case is, however, "satisfied only if the misrepresentation touches upon the reasons for the investment's decline in value." *Sharp*, 649 F.2d at 186, n. 16 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981)). In this case, plaintiffs suffered a loss when, having given the guarantee on the Valley Loan, VTI then had to honor that guarantee. Complt. ¶ 59(a). Since the misrepresentations concerned VisionTech's corporate health, and the state of corporate health was a factor in VTI's

---

**10.** Other consideration included, for example, a promise by "VisionTech's Board of Directors [that it] would furnish a resolution indicating that the Board would forbear from commencing a voluntary insolvency proceeding for a period of ninety (90) days from the date of the Valley Loan in order to allow VTI to perfect its interest in the collateral (the "Board Resolution"). Complt., ¶ 46(b).

**11.** "Transaction causation" means that investor would not have engaged in transaction had other party made truthful statements at time required. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988).

**12.** "Loss causation" means that investor would not have suffered loss if facts were what he believed them to be. *Id.*

decision to guarantee the loan, the loss suffered as a result of the "bad loan" could be seen as related to the misrepresentations. Unfortunately for the plaintiffs, this factual scenario is not one which states a claim under § 10(b) or Rule 10b–5 because the loan guarantee is not a security. Merely claiming, as plaintiffs did in their memorandum of law, that the New Warrants were rendered worthless as a "proximate result" of the misrepresentations does not make it true. The misrepresentations simply have no connection to any conceivable loss suffered from the exchange of the warrants, they are not the proximate reason for pecuniary loss. *Cf. Huddleston,* 640 F.2d at 549.

The Securities Exchange Act of 1934 and the rules promulgated thereunder impose liability for a proscribed act "in connection with" the sale or purchase of a security; it is not sufficient to allege that defendants committed a proscribed act in a transaction of which the exchange of securities is, at best, an incidental part. *See, e.g., Chemical Bank,* 726 F.2d at 943; The Court views the transactions in the case at bar as factually similar to those which occurred in *Chemical Bank.* There, the misrepresentations at issue induced the banks to renew loans collateralized by a pledge of securities about which no misrepresentations were made. Contrary to the dissenting view espoused by Judge Van Graafeiland, *see* 726 F.2d at 947, the Court did not view the guarantee of the loan and the pledge of stock as integral parts of a single seamless web, and accordingly found no § 10(b) connection.

Plaintiffs claim that the holding in *Chemical Bank* is contrary to Third Circuit jurisprudence and, moreover, that the transactions at issue are not similar to those in *Chemical Bank,* but resemble those at issue in *Securities and Exchange Commission v. Drysdale Securities Corporation,* 785 F.2d 38 (2d Cir.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986).

Addressing each argument separately: first, the Court is not persuaded by plaintiffs reliance upon *Harrisburg v. Bradford Trust Co.,* 621 F.Supp. 463 (M.D.Pa.1985). In *Harrisburg,* the Court stated, "[t]he Third Circuit's opinion in *Angelastro* discussed the *Chemical Bank* holding and declined to follow it ... this court does not consider that *Chemical Bank* states the law in this circuit." This Court does not agree. In *Angelastro* the Third Circuit specifically stated,

> [In *Chemical Bank* ] [t]he Second Circuit was concerned that every bank loan partially secured by the pledge of stock might fall within the scope of section 10(b). We also agree that too broad an interpretation of § 10(b) is unwarranted, but our decision here is not inconsistent with *Chemical Bank.* Misrepresentation of the credit terms of a margin account, which is what purportedly occurred here, is a different situation from that in *Chemical Bank,* and clearly meets the 'in connection with' requirement.

764 F.2d at 946. The difference in result reached by the *Angelastro* Court when faced with a factual scenario different from that presented in *Chemical Bank* does not compel this Court to conclude that the Third Circuit has repudiated the validity of *Chemical Bank.* Moreover, the Court is unaware of any subsequent Third Circuit jurisprudence to the contrary.

As to plaintiff's second contention that this matter is factually similar to *Drysdale,* the Court does not agree. In *Drysdale* the alleged misrepresentations were made with respect to the financial condition of a company involved in securities repurchase transactions, and its ability to effectuate those transactions, a factor directly dependent upon financial condition. Such misrepresentations directly involve the consideration for a securities transaction and are thus closely linked to transfers of securities. 785 F.2d at 41.

Here, the alleged misrepresentations pertained to a commercial loan transaction in which the consideration included, *inter alia,* the New Warrants. The distinction is clear, in *Drysdale,* securities were transferred as a direct result of a misrepresentation, whereas here the direct result of the

misrepresentations was a loan and not a securities transfer. 785 F.2d at 43.

This Court recognizes that although the "in connection with" language has generated considerable confusion, discussion and comment in judicial opinions and legal critique, *see, e.g., Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Chemical Bank,* 726 F.2d 930 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Ketchum v. Green,* 557 F.2d 1022 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977); *Reliance Insurance Co. v. Eisner & Lubin,* 685 F.Supp. 449 (D.N.J.1988), *aff'd* 897 F.2d 523 (3d Cir.1990); Note, *The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissal of Rule 10b–5 Private Claims for Damages,* 56 Tex.L.Rev. 62 (1977); 2 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 4.7(574)(3), at 88.34 (1982), it has not yet been construed to encompass the situation currently before the Court, that is an exchange or sale of securities transactionally remote and tangentially related to the primary transaction affected by the misrepresentations. Thus, to allow these plaintiffs, whose purchase of securities is so attenuated from the transaction affected by the claimed misrepresentations, to bring a cause of action under Rule 10b–5 would strain the plain language of the Rule past the breaking point.[13]

### 2. *Count Six*

The sixth count of plaintiffs' complaint alleges that Samuel, Janis, Caroline, Tara and Marjorie Oolie ("the Oolie plaintiffs"), Berman and Saks purchased VisionTech stock, (Complt., ¶ 78); that defendants uti-lized the United States mails and interstate wires in connection with those purchases, (Complt., ¶ 79); that defendants knowingly or recklessly made fraudulent statements (Complt., ¶ 80); and that as a direct and proximate result of defendants' fraudulent conduct, plaintiffs sustained damages. (Complt., ¶ 82). Plaintiffs contend that such conduct by defendants violates Rule 10b–5 and § 10(b). (Complt., ¶ 83).

■ As indicated in the Court's earlier discussion of Count Five, fraudulent conduct held violative of Rule 10b–5 must be in connection with "the purchase or sale" of a security. Accordingly, potential plaintiffs are limited to actual purchasers and sellers. *Blue Chip Stamps,* 421 U.S. at 731–49, 95 S.Ct. at 1923–32 (approving *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)). Shareholders who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material are thus precluded from bringing a private action under Rule 10b–5. *Blue Chip Stamps,* 421 U.S. at 737–38, 95 S.Ct. at 1926; *see also Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 790 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983) (plaintiff's allegations of mere inducement to retain stock found insufficient for liability under Rule 10b–5).

The individual plaintiffs named in Count Six claim "purchaser" standing under Rule 10b–5. (Complt., ¶ 78). A search through the complaint, however, reveals a major flaw in the allegations: most of the stock purchases alleged as the result of the Rule 10b–5 violation were made prior to any

---

13. The Court is aware of *Superintendent of Insurance v. Bankers Life & Casualty Co.,* wherein Justice Douglas referred to the plaintiff's having "suffered an injury as a result of deceptive practices touching its sale of securities as an investor," 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971), however, the Court does not view the facts of this case as falling within the ambit of the "touching" language. Moreover, the Court does not regard Justice Douglas' use of "touching" as an expansion of the "in connection with" language, for under the facts of that case, it is clear that there was an act or practice that operated as a fraud on the seller of the securities, in that although full price was paid for bonds, the seller was duped into believing that it would receive the proceeds. 404 U.S. at 9, 92 S.Ct. at 167. Thus, the Court is in agreement with Judge Friendly's assessment that Justice Douglas' use of "touching" as his variation on the "in connection with" language was nothing more than a matter of literary style. *Chemical Bank,* 726 F.2d at 942.

claimed fraudulent misrepresentation.[14] For example, Sam Oolie purchased 11,000 shares of stock on July 11, 1986 and 20,000 shares on October 31, 1986 (Complt., ¶¶ 22, 24); Saks purchased 8,000 shares in June, 1987 (Complt., ¶ 23); Marjorie Oolie purchased 15,000 shares on September 18, 1986 and 5,000 shares on June 26, 1986 (Complt., ¶¶ 24, 31); Janis, Caroline and Tara Oolie purchased 3,000 shares on October 31, 1986 (Complt., ¶ 25); and Janis Oolie purchased 5,000 shares on June 14, 1987 (Complt., ¶ 30). The disputed misrepresentations are alleged to have occurred between July 1987 and January 20, 1988 (Complt., ¶¶ 34, 41, 42, 44, 45, 47, 80). Thus, *only* the purchase of 6,000 shares by Berman during August 1987 (Complt., ¶ 23) ("the First Purchase") and the collective purchase of 3,000 shares by Janis, Caroline and Tara Oolie on August 27, 1987 (Complt., ¶ 37) ("the Second Purchase" or "the JCT Oolies") occurred *subsequent* to any misrepresentations allegedly made by defendants.

Although the First and Second Purchases occurred after the disputed misrepresentations, they were not made in reliance upon any statement by a named defendant. The First Purchase was made "based upon [Sam] Oolie's recommendation." Complt., ¶ 23. The Second Purchase although claimed to have been made "[i]n reliance upon Gerken's representations ..." (Complt., ¶ 37), could not have been made in *direct* reliance upon Gerken because the complaint never alleges any contact between Gerken and any plaintiff except Sam Oolie. If, however, the allegations of consecutive paragraphs were read together, the Court could logically infer that the Second Purchase was made in reliance upon Sam Oolie's recommendation, *after* Sam Oolie spoke to Gerken. The paragraph preceding that pertaining to the Second Purchase states,

> 36. In reliance upon Gerken's material representations, during July 1987, Oolie continued to hold his previous purchases of Visiontech's stock. Gerken encouraged Oolie to also purchase 30,000 shares of Visiontech at their public trading price to average down.

Thus, the Court is faced with two issues, first, whether a misrepresentation communicated to one person can support a claim for fraud by another person; and second, whether plaintiffs complaint contains allegations sufficient to support such a claim.

Although addressed by both parties in their submissions to the Court, neither defendants nor plaintiffs cite Third Circuit jurisprudence on the issue of derivative reliance. Plaintiffs rely upon Second Circuit authority for the proposition that a third-party misrepresentation is actionable "if the maker of the misrepresentation intended or has reason to expect that the statement will be repeated to the other person." Pltf.Mem., 3 (quoting *Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F.Supp. 1252, 1261 (S.D.N.Y.1988)).[15]

**14.** Since the majority of stock purchases were made prior to any misrepresentations, those purchases could not have been induced by any alleged fraudulent conduct by defendants and those plaintiffs lack "purchaser" standing. The complaint is bare of allegations that any plaintiff was fraudulently induced to sell stock, thus plaintiffs lack "seller" standing. Plaintiffs do, however, aver that they "elected to hold and not sell" their VisionTech stock. Complt., ¶¶ 49, 61. As previously explained, under *Blue Chip Stamps* mere retention of stock is insufficient to give plaintiffs standing under Rule 10b–5. 421 U.S. at 737, 95 S.Ct. at 1926.

**15.** In *Chase Manhattan* the Court was presented with an alleged Rule 10b–5 violation. Plaintiffs cite the standard employed by the Court correctly, however, it is equally important to note that the Court dismissed the purported 10b–5 claim because the plaintiff failed to allege *either* the requisite two stage theory of reliance, i.e. communication from the first party to the second party to the third party, *or* that if the communication was relayed, it was intended or expected to be relayed. The Court relied upon *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 765–66 (2d Cir.1986), to determine the applicable standard for misrepresentation liability. That case, however, did not concern fraudulent misrepresentations in a securities context, but rather common law fraudulent misrepresentations in the context of film licensing. The Third Circuit has not yet engaged in wholesale importation of the rules of common law fraud to determine the parameters of liability under Rule 10b–5. The Supreme Court, however, has at times relied upon the common law to decide matters involving securities fraud. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 227–28,

In response, defendants implicitly accept plaintiffs' proposition, but contend that the complaint is deficient for failure to allege that plaintiffs were the intended or expected recipients of the information upon which they allegedly relied. Def.Reply, 14.

Although the Third Circuit has not directly addressed this particular variation of derivative liability, there is some authority relative to third party liability for fraudulent misrepresentations. In *Landy v. Federal Deposit Insurance Corporation*, 486 F.2d 139 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), plaintiffs claimed to have purchased bank stock in reliance upon certified financial statements which were false and misleading because they failed to disclose important facts. Plaintiffs sued, among others, the accounting firm that had prepared the certified financials claiming that the firm had issued an erroneous certification of the condition of the bank.

The district court entered summary judgment against several plaintiffs for two reasons: (1) no misrepresentations were made to those parties; and (2) their depositions revealed that they did not rely upon any written report in making their stock purchase. On appeal, plaintiffs claimed that it was foreseeable that the accountant's reports would be used for financial statements distributed regularly to the shareholders, and thus the accountant should be held liable for any subsequent injury.

The Third Circuit disagreed with the district court's analysis. Reviewing the record, the Court concluded that without proof that the accountant knew or expected his financial statements to be exhibited to potential purchasers or sellers or that he should have known the statements would be used by the corporation in preparing material for publication, the Court would not "extend rule 10b–5 to cover [the accountant's] statements by finding them 'in connection with the purchase or sale of any security.'" 486 F.2d at 168.[16] In reaching its conclusion, the Third Circuit refused to apply the reasonable foreseeability standard urged by the plaintiff and stated that,

> To the extent that the 'in connection with' requirement narrows liability to less than the foreseeable class of injured persons, rule 10b–5 liability is constricted to a smaller field than common law liability. The common law extends a defendant's liability for 'fraud' to all those persons whom he should reasonably have foreseen would be injured by his misrepresentations. Although common law precepts are important guideposts in defining liability under federal securities laws, they are not determinative.

486 F.2d at 169.

Applying these principles to the case at hand, the Court finds that the type of reliance presumably alleged by plaintiffs cannot be deemed insufficient as a matter of law. There is no requirement in Rule 10b–5 cases that there be direct contact between plaintiff and defendant. *See Walsh v. Butcher & Sherrerd*, 452 F.Supp. 80, 84 (E.D.Pa.1978) (accepting the theory that the alleged misrepresentations or omissions made to one party caused that party to recommend the stock purchase to plaintiff); *SEC v. Penn Central Co.*, 450 F.Supp. 908, 912–14 (E.D.Pa.1978) (plaintiff must show that defendants' fraud proximately caused material misrepresentations or omissions violative of the securities laws; and misrepresentations or omissions must have been the foreseeable result of defendants' conduct). Other Circuits have addressed the issue of derivative liability with similar results. *See, e.g., Austin v. Loftsgaarden*, 675 F.2d 168, 177–78 (8th Cir.1982) (third parties upon whom plaintiffs relied testified that they relied upon the offering memorandum); *Keirnan v. Homeland, Inc.*, 611 F.2d 785, 789–90 (9th

100 S.Ct. 1108, 1114 (1980) (reliance upon the common law rule that, "misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent").

**16.** The Court cited *Wessel v. Buhler*, 437 F.2d 279 (9th Cir.1971) in support of its conclusion.

In *Wessel* the Ninth Circuit followed the test set forth in *SEC v. Texas Gulf Sulphur Company*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that Rule 10b–5 is violated whenever assertions are made in a manner reasonably calculated to influence the investing public. 437 F.2d at 282.

Cir.1980) (derivative reliance theory disallowed only because it was raised for the first time on appeal and plaintiff failed to introduce any evidence that third parties upon whom he purportedly relied did themselves rely on any misrepresentations); *Zuckerman v. Harnischfeger Corp.*, 591 F.Supp. 112, 121–22 (S.D.N.Y.1984) (to state a claim under a derivative reliance theory plaintiff must allege justifiable reliance); *Hudson v. Capital Mgmt. Int'l, Inc.*, 565 F.Supp. 615, 621–22 (N.D.Cal. 1983) (transactional nexus requires pleading reliance upon third party who had access to deceptive materials which plaintiffs did not see).

■ Although the Court is satisfied that a closely linked causal chain can establish third party reliance sufficient to state a claim under Rule 10b–5, in this case plaintiffs have failed to allege such a causal chain. Plaintiffs never assert that Sam Oolie did himself rely upon the misrepresentations or that the misrepresentations were given to Berman or the JCT Oolies or that the transfer of misrepresentations was foreseen or reasonably calculated to influence the investing public. In each recited instance of alleged misrepresentation, the complaint merely states that the disputed misrepresentations were given to Sam Oolie: "during July 1987, [Sam] Oolie spoke from New Jersey to Gerken," (Complt., ¶ 34); "Keenan and Gamsey advised [Sam] Oolie," (Complt., ¶ 41); "Keenan and Gamsey represented to [Sam] Oolie," (Complt., ¶ 42); "Gamsey and the Board of Directors of Visiontech caused Visiontech's business plan ... to be sent to [Sam] Oolie," (Complt., ¶ 44); "as a result of Oolie's request, Keenan, Gamsey and Gerken represented from Georgia by telephone to, [Sam] Oolie," (Complt., ¶ 45); and "Keenan sent to VTI and [Sam] Oolie," (Complt., ¶ 47).

Perhaps recognizing the pleading deficiencies on this issue, plaintiffs now attempt to supplement the complaint with additional allegations in their opposition papers submitted to the Court. Pltf.Mem., 3–5, 10. As previously indicated, however, on a 12(b)(6) motion to dismiss, the district court's consideration is limited to the facts alleged in the complaint; information provided to supplement the complaint is not considered to determine the sufficiency of a pleading. *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978); *see supra* Section A(1). Plaintiffs failure to allege reliance cannot be overlooked. Reliance is a well recognized element of a Rule 10b–5 cause of action and is presumed only where logical to do so, primarily in cases involving omissions. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 186 (3d Cir.1981) (citing cases). Such cases present unique problems of demonstrating reliance not present in this matter, moreover, Count Six contains only allegations of misrepresentations, not omissions. Nor can plaintiffs circumvent the need to plead reliance by asserting a fraud on the market theory rather than alleging direct reliance upon defendants' misrepresentations. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 241–47, 108 S.Ct. 978, 988–92, 99 L.Ed.2d 194 (1988); *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986); *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Thus, the fact that plaintiffs allege only that the misrepresentations were conveyed to Sam Oolie, and fail to allege that he himself relied upon the misrepresentations, and relayed them to Berman and the JCT Oolies, or that defendants knew or expected that the misrepresentations would be relayed, must result in the dismissal of Count Six.

■ Even if plaintiffs alleged the necessary reliance to establish that the disputed misrepresentations were "in connection with" the First and Second Purchases, however, Count Six would still fail because the disputed misrepresentations are not actionable under Rule 10b–5. Scrutinizing each misrepresentation, it is evident that the disputed statements are either true statements or can be characterized as "puffing," predictions, or mere opinion. Clause (2) of Rule 10b–5 proscribes "any untrue statement of a material fact...." The definition of a fact cannot be found in any security law or rule promulgated thereunder, a situation that has resulted in much fodder for the litigation mill. When faced

with the issue, courts have distinguished between historical facts, bald predictions regarding future events, such as what the earnings of a business will be next year or two years from now, or mere opinions based upon nothing more than the alleged "expertise" of the opinionator, such as the value of an asset which is not fungible and for which there is no established market or published quotations. *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 775 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (projections, forecasts and opinions are actionable in a variety of circumstances) (citing a list of supporting cases); *see also, Flournoy v. Peyson*, 701 F.Supp. 1370, 1376 (N.D.Ill.1988) (agent's indication that seller had "good" investment opportunity and seller's guarantee that investor would earn at least 100% profit in short time were material statements of fact, rather than nonactionable mere opinion or "puffing"); *In re Kulicke & Soffa Industries, Inc. Securities Litigation*, 697 F.Supp. 183, 185 (E.D.Pa.1988) (forecast or opinion is actionable as untrue statement if made without genuine belief or reasonable basis and with reckless disregard for its truth or falsity or with lack of genuine belief in accuracy or completeness).

The Third Circuit has held that a forecast or opinion is actionable as an untrue statement if it is made without a genuine belief or reasonable basis and if made "with reckless disregard for its truth or falsity or with a lack of genuine belief that the information disclosed was accurate and complete in all material respects." *Eisenberg*, 766 F.2d at 776 (citations omitted). The Court has also held that a well reasoned and justified statement of opinion with a sound historical or factual basis is not actionable. 766 F.2d at 776.

An "omitted fact" is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc.*, 485 U.S. at 231, 108 S.Ct. at 983 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757

(1976). The question thus becomes whether the reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell. *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir.1988). The Court will now review each of the specific misrepresentations under the standards set forth above.

**PARAGRAPH 34:** During July 1987 ... Gerken made the following misrepresentations:

(a) Assuring Oolie that VTI's position with respect to the Letter of Credit concerning the Equipment Lease was secure and not in jeopardy;

(b) Assuring Oolie that the agreement with R & D would successfully result in locating a viable marketing business acquirer for Visiontech;

(c) Assuring Oolie that the decline in the stock value was attributable to former founder/stockholders of Visiontech selling their stock without just cause and the business community's misunderstanding of Allergan's June 24, 1987 election to permit an option to purchase 2,804,000 shares of Visiontech at $.25 per share to lapse;

(d) Visiontech's stock rising, in the near future, to $10.00 per share was not unreasonable.

Plaintiffs have failed to point to any evidence that these statements were false or misleading. First, the representation in regard to the Letter of Credit is an opinion. In view of the fact that in April, 1987 Valley National Bank issued the Letter of Credit in favor of SECA Leasing Corp. to act as credit support for and equipment lease by and between SECA as lessor and Visiontech, (Complt., ¶¶ 27, 28) and that during June 1987, the Automated Lathing Equipment had been installed at Visiontech's headquarters, (Complt., ¶ 32) Gerken's opinion was not unreasonable and had a sound factual basis. Second, the prediction that a viable marketing business acquirer for Visiontech would be located is equally reasonable and factually sound. Nothing in the complaint indicates that Gerken should not have reasonably be-

lieved that Visiontech could not be sold. The third representation is not untrue, and the fourth is an opinion.

The fourth representation, by its very terms claims that a future increase in stock price would "not [be] unreasonable. VTI's past success and current growth provided sound historical and factual basis for Gerken's opinion at the time it was given. Complt., ¶¶ 27, 28, 32. Moreover, Gerken had every reason to believe that the company's research and development program would be successful in its design or construction of a unique technique for producing commercially successful soft contact lenses, and under such circumstances, a rise in stock value would not be unusual.

**PARAGRAPH 41:** Keenan and Gamsey advised Oolie that they ... had decided, concerning Visiontech:

(a) To abandon the Automated Lathing Technique and shift all emphasis to Lombart;

(b) Lombart was going to be enormously profitable in that: 1) Lombart was waiting routine approval from the Food and Drug Administration to manufacture and market certain lenses; 2) Lombart's product line was pre-sold; and 3) Lombart's Neefe embryo processes will significantly reduce its current manufacturing costs;

(c) To sell, at auction, the equipment relating to the abandoned Automated Lathing Equipment;

(d) By selling the equipment at least $.80 on the dollar, the liability of VTI to SECA under the Letter of Credit would be reduced from approximately $1,500,-000 to $600,000;

(e) To request VTI to cause Valley to lend to Visiontech the sum of $600,000 (the "Valley Loan"). VTI would guaranty the Valley Loan;

(f) That in exchange for VTI's consent to the sale of the equipment, VTI would receive from Visiontech new collateral consisting of: 1) an assignment of rights to a lawsuit against the manufacturer of the leased equipment (Optical Holdings, Ltd.); 2) an assignment of accounts receivable in the amount of $119,000; 3) a

pledge of the stock of Lombart which would only be subordinate to R & D's security interest (the "Stock Pledge"); and 4) a first lien on the equipment and personal property of Visiontech.

 Again, plaintiffs have failed to point to any evidence that statements (a), (c), (d), (e), or (f) were untrue. Only subparagraph (b) requires the Court's comment. In that representation, the claim that Lombart "was going to be enormously profitable" was expressly predicated on three factual assertions. The assertions together provide a sound basis for the reasonable assertion that Lombart would be profitable. Obviously, if Lombart never received FDA approval, it would not become profitable. If the representation was that FDA approval had been received, and in fact Lombart was awaiting approval, plaintiffs could argue misrepresentation. But Keenan and Gamsey accurately presented the status of FDA approval and the other facts which provided a basis for the opinion of projected profitability.

**PARAGRAPH 42:** Keenan and Gamsey represented to Oolie that Visiontech was carrying its inventory at a cost of $460,000 and, in fact, such inventory had a market value of $1,840,000 which would further assure VTI that its financial position in Visiontech was secure; and that Visiontech would, in the near future, realize a positive cash flow of in excess of $60,000 per month.

 Once again, plaintiffs fail to state the content of the representation alleged to have been false. The Court is required to guess which phrase contained in paragraph 42 constitutes an alleged misrepresentation: is it the carrying value of the inventory? If so, of what possible import would that have had to plaintiffs' decision to exchange warrants. The Court sees none, therefore the first phrase is immaterial. Phrase two purports to be an opinion as to the market value of the inventory. Plaintiffs fail to provide a different "more accurate" version of the market value, however, and even if the inventory had a higher market value than "carried," that "fact" would not alter the total mix of information

available to the reasonable investor. The third phrase, "realize a positive cash flow of in excess of $60,000 per month" can only be characterized as "puffery" because it is such an emphatic statement of opinion. Moreover, plaintiffs have not alleged that the cash-flow projections were not prepared in a reasonable manner or with a firm basis. Paragraph 42 does not present an actionable misrepresentation.

**PARAGRAPH 44:** Gamsey ... sent [the Business Plan] to Oolie. The Business Plan portrayed Visiontech as a very solvent but illiquid company having a considerable net worth in excess of $2,900,000 but poor cash flow.

 In the absence of any allegation that the information disclosed in the Business Plan was inaccurate or incomplete in *some* respect, the Court need not analyze the potential materiality of this representation. However, assuming arguendo that the company was not solvent and that the net worth was less that $2,900,000, the representation is immaterial to a decision to exchange warrants exercisable at $1.56 for ones exercisable at $.23. Indeed, the Court cannot envision any information that would persuade an investor to retain warrants exercisable at a higher price rather than exchange them for ones exercisable at a lower price.

**PARAGRAPH 45:** Ultimately, as a result of Oolie's request, Keenan, Gamsey and Gerken represented from Georgia by telephone to Oolie who was in New Jersey, during mid-December 1987 and early January 1988 that, in addition to the representations recited in paragraphs 34 and 41, they, R & D, Prudential Bache and Burns agreed that the following commitments would be honored:

(a) R & D would provide a guaranty of the Valley loan to an extent of $100,000 (the "R & D Guaranty");

(b) Visiontech's Board of Directors would furnish a resolution indicating that the Board would forbear from commencing a voluntary insolvency proceeding for a period of 90 days from the date of the Valley loan in order to allow VTI to perfect its interest in the collateral (the "Board Resolution"); [and]

(c) VTI would receive 3,000,000 new warrants exercisable at approximately $.23 per share for five (5) years (the "New Warrants") in lieu of the Old Warrants.

 Plaintiffs' pleading in regard to paragraph 45 suffers from the same factual deficiency the Court commented upon in reference to representations discussed previously. This representation, although possibly construable as the basis for a breach of contract action, provides no basis for any inference of fraud, and fails to satisfy the "particularity" requirement of Fed.R. Civ.P. 9(b). Although courts have relaxed the rule of particularity when factual information is peculiarly within the defendant's knowledge or control, "even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendant's control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (1989). Searching the Amended Complaint, the Court finds that even under the relaxed pleading standard of *Craftmatic*, the pleadings are deficient; plaintiffs present no statement of facts upon which the allegations are based.

**PARAGRAPH 47:** On or about January 20, 1988, Keenan sent to VTI and Oolie cash flow projections for VTI that represented that a positive cash flow of $58,106 would commence in June 1988 and increase substantially thereafter.

The last disputed representations demonstrates the pleading deficiencies that permeate the Amended Complaint. Plaintiffs' bare allegation that paragraph 47 is a misrepresentation is insufficient to state a claim under Rule 10b–5. A projection that is subsequently unrealized is not necessarily a misrepresentation; it can be a misrepresentation if made without a reasonable factual basis. Plaintiffs do not contend that the ¶ 47 projection was unreasonable, nor do plaintiffs allege a lack of reasonable bases for the projection. Thus the aver-

ment of fraud is mere suspicion and does not satisfy the pleading requirements of *Craftmatic* described above. For all the reasons stated above Count Six will be dismissed.

### 3. *Count Seven*

 In Count Seven plaintiffs seek to impose liability on defendants for alleged violations of § 12(2) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77*l*(2) (1988) ("§ 12(2)"). Section 12(2) provides that any person who offers or sells a security by means of a prospectus or oral communication that makes misstatements or omissions of material fact "shall be liable to the person purchasing such a security from him." 15 U.S.C. § 77*l*(2) (1988). As a threshold matter the Court must determine whether any of the defendants fall within the class of persons subject to liability under § 12.

The Supreme Court, undeterred by the lack of definitions contained in the Securities Act and without guidance from legislative history, has parsed from the statutory language itself an image of a Section 12 statutory seller. In *Pinter v. Dahl,* the Court began its analysis by reaffirming that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value. The Court then discussed pertinent statutory terms such as "offer," "sell" and "purchase," and concluded that § 12(1) liability extended to those who solicit securities purchases, motivated at least in part by a desire to serve her own financial interests or those of the securities owner. 486 U.S. 622, 647, 108 S.Ct. 2063, 2079, 100 L.Ed.2d 658 (1988).

Although the *Pinter* Court considered the scope of seller liability in the context of § 12(1), the Third Circuit recently held that "given the identical language of sections 12(1) and 12(2), as well as the Securities Act's overall objective of disclosure, we see no reason to distinguish the scope of 'seller' for purposes of § 12(1) and § 12(2)." *Craftmatic,* 890 F.2d at 635. The Court noted, however, that the term "solicitation" does not encompass all activities related to the purchase transaction. Rather, "the

purchaser must demonstrate direct and active participation in the solicitation of the immediate sale" to establish § 12(2) seller liability. 890 F.2d at 636. Thus, liability under § 12(2) can attach either to a "seller" or one who actively solicits for financial gain.

By alleging in Count Seven that defendants "actively solicited" VTI to purchase the New Warrants as recited in paragraphs 41, 42, 44, 45, and 47 (Complt., ¶ 85), plaintiffs attempt to make a claim within the parameters of *Pinter.* Although facially appealing, these allegations fail to state a § 12(2) claim because none of the referenced paragraphs involve any solicitation by defendants.

Paragraphs 41, 42 and 44 recite conduct predating any mention of the New Warrants and as such can hardly constitute active solicitation. Paragraph 45 is similarly unavailing to plaintiffs' claim because it merely alleges that "Keenan, Gamsey and Gerken represented to Oolie ... [that] they, R & D, Prudential Bache and Burns agreed [to honor] the following commitments: ... VTI would receive ... new warrants ... in lieu of the Old Warrants." The language employed by plaintiffs in paragraph 45 is noticeably devoid of any suggestion of solicitation. There is no mention of urging, or persuasion, words used by the Supreme Court in *Pinter* to describe the act of solicitation. Nor is there language directed at producing a sale; merely acknowledging a prior commitment is more analogous to reaffirming a contractual obligation than active solicitation. As the Supreme Court stated,

> The solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer, and it is *directed at producing the sale.* In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors. Thus, solicitation is the stage at which an investor is most likely to be

injured, that is, by being persuaded to purchase securities without full and fair information.

*Pinter,* 486 U.S. at 646–47, 108 S.Ct. at 2078. The language in paragraph 45 does not imply conduct in the first stage of a securities sale, rather it suggests final stage negotiation or closing transactions. Moreover, reading paragraph 43, "Oolie ultimately asked for further concessions" and paragraph 45, "[u]ltimately, as a result of Oolie's request" *together,* it is evident that the commitment to exchange warrants was made at Oolie's request as a concession to a buyer, a scenario diametrically opposed to that of a typical solicitation.

The final allegation cited by plaintiffs as evidencing solicitation, paragraph 47, contains no language remotely related to solicitation, nor any hint of persuasion or urging a purchase. Paragraph 47 merely alleges that Keenan sent Oolie cash flow projections. In summary, plaintiffs have failed to carry their burden as required by *Pinter* and *Craftmatic* of demonstrating direct and active participation in the solicitation of a sale.

Even if the recited allegations actually constituted active and direct solicitation Count Seven would still fail to state a claim under § 12(2). Analytically, a demonstration of active solicitation only satisfies the first requirement for § 12(2) liability, a finding that defendants are statutory sellers. Not all statutory sellers, however, are liable under § 12(2). In *Pinter* the Supreme Court specifically rejected the view that the Securities Acts impose strict liability on all sellers; rather, the Court held that Congress intended seller liability to extend only to those persons soliciting securities sales for financial gain. 486 U.S. at 647,

108 S.Ct. at 2078–79. Plaintiffs' failure to allege any personal or direct financial benefit to the seller is fatal to their purported § 12(2) claim.[17] Count Seven will be dismissed for failure to state a claim upon which relief can be granted.

### 4. *Count Eight*

■ The allegations in Count Eight mirror those of Count Seven with the exception of the security allegedly involved. In Count Seven the claimed violation of § 12(2) related to the exchange of warrants, whereas, in Count Eight, plaintiffs' allegations relate to certain purchases of VisionTech stock. Complt., ¶ 93. Simply substituting allegations regarding the VisionTech stock purchase for those relating to exchanging warrants is insufficient to remedy the fatal deficiencies identified in Count Seven, thus Count Eight similarly requires dismissal.

Count Eight alleges open-market purchases of VisionTech stock. Once again, plaintiffs claim defendants actively solicited the securities purchase as recited in paragraphs 34, 41, 42, 44, 45, 47. Complt., ¶ 93. By asserting their purported § 12(2) claim in terms of "active solicitation" plaintiffs implicitly concede that plaintiff and defendant are not in the traditional buyer-seller relationship, and that defendants did not transfer title to the individual plaintiffs.

This claim suffers from infirmities identified in the Court's discussion of Count Six. The alleged solicitations in paragraphs 34, 41, 42, 44, 45, and 47, took place between July 1987 and January 20, 1988. All the stock purchases of the plaintiffs occurred prior to July 1987 with the exception of two purchases made in August of 1987: 3,000

---

17. The Court finds plaintiffs' argument that the individual defendants are liable under a theory of meaningful participation meritless in light of the Supreme Court's decision in *Pinter* specifically rejecting the "substantial factor" test. 486 U.S. at 648–54, 108 S.Ct. at 2079–82. This conclusion is supported by the Third Circuit's decision in *Craftmatic.* There, in reliance upon the Supreme Court's rejection of a test for "seller" that imposed liability on persons whose actions were merely a "substantial factor" in causing the purchase, the Court held that persons who

fail to qualify as sellers under the *Pinter* standard may not be held liable under § 12(2) on an aiding and abetting theory. 890 F.2d at 636.

In view of the Court's decision that the referenced allegations in count seven fail to demonstrate active solicitation, the Court need not consider plaintiffs' claim that active solicitation by Gerken, Gamsey and Keenan is chargeable to defendants R & D and Pru–Bache under the theory that R & D and Pru–Bache control the individual defendants. (Complt., 87).

shares purchased by the JCT Oolies (Complt., ¶ 37), and 6,000 shares purchased by Berman (Complt., ¶ 23). Thus, the Court's inquiry is narrowed to the purported solicitation of those two purchases.

Neither purchase was directly solicited by any defendant. Both purchases were made based upon Sam Oolie's recommendation. (See discussion in Count Six, *supra*). Without direct or active solicitation plaintiffs fail to state a claim under § 12(2). (See discussion of *Pinter* and *Craftmatic* in Count Seven). Oolie's recommendations to the JCT Oolies and Berman constitute nothing more than giving gratuitous advice very similar to the advice Dahl provided to other Dahl investors in *Pinter*. With respect to those recommendations, the Supreme Court declared, "[w]hen a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.'" 486 U.S. at 647, 108 S.Ct. at 2078.

In the absence of any active and direct solicitation by the defendants or an allegation that Sam Oolie was the agent of a principal of the securities transaction, the defendants cannot be deemed "sellers" within the meaning of § 12(2). Thus, Count Eight will be dismissed.

5. *Count Nine*

■ In Count Nine plaintiffs assert that defendants Pru–Bache and R & D are liable derivatively for the Securities Acts violations of the individual defendants on a theory of control person liability under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Section 20(a) provides:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the con-

trolling person acted in good faith and did not directly or indirectly induce the act or act constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1988). Because the Court has found no merit to the asserted core violations of the securities laws it follows that the derivative allegations of control are likewise without merit and must be dismissed as a matter of law. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 16–17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Bosio v. Norbay Securities, Inc.*, 599 F.Supp. 1563, 1568 (E.D.N.Y.1985); *Jenkins v. Fidelity Bank*, 365 F.Supp. 1391, 1402 (E.D. Pa.1973); *cf., Elysian Federal Sav. Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737, 751 n. 18 (D.N.J.1989) (holding in the obverse situation, that because defendant's motion to dismiss plaintiff's claims under § 12(2) and 10(b) were denied, defendant's further motion to dismiss the claims of controlled person's liability must likewise be denied).

Were it otherwise, the Court would nevertheless be constrained to dismiss plaintiffs' claims for insufficiency of pleading. At a minimum, to plead control liability plaintiffs must identify the relationship on which the alleged control is based. The Amended Complaint contains mere conclusory assertions unbuttressed by supporting factual allegations. Complt., ¶¶ 101, 32(a), 107, 108. In *Rochez Brothers, Inc. v. Rhoades (Rochez II)*, 527 F.2d 880, 885 (3d Cir.1975), the Third Circuit clearly indicated that secondary liability under § 20(a) is limited to those persons culpably participating in the wrongdoing creating the liability. Here, plaintiffs allege only knowledge of wrongful conduct (Complt., ¶ 103) and fail to allege any knowing and substantial participation in the wrongdoing. *See Gould v. American–Hawaiian Steamship Co.*, 535 F.2d 761, 779 (3d Cir.1976). Nor have plaintiffs alleged deliberate inaction, done intentionally to further the fraud. *Rochez*, 527 F.2d at 890. Thus even if the dismissal of Counts Five through Eight was not fatal to Count Nine, the Court would dismiss Count Nine for failure to plead the requi-

site elements to establish control liability under § 20(a).

### 6. Count Eleven

■ Count Eleven, a purported Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, continues to demonstrate the pleading omissions that suffuse the Amended Complaint. As originally pled, plaintiffs' RICO claim suffered from many defects, including a lack of specificity. The Amended Complaint fares no better. Indeed, it is inadequate in several ways, and notable in that it requires the Court, as a threshold matter, to decipher the nature of plaintiffs' complaint. Although the Court is mindful of the Third Circuits' admonition in *Saporito v. Combustion Engineering Inc.*, 843 F.2d 666 (3d Cir.1988), *vacated on other grounds*, — U.S. ——, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989), not to read the particularity requirement of Fed.R.Civ.P. 9(b) too narrowly, the pleadings before the Court fail to provide the minimum notice required by that Rule. The Amended Complaint fails to allege which substantive provision of 18 U.S.C. § 1962 was violated and how.

In paragraph 116, plaintiffs claim entitlement "to damages pursuant to 18 U.S.C. § 1964." Construing plaintiffs' allegations liberally, as the Court is required to do in considering a Rule 12(b)(6) motion, *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), it is apparent that only subsection (c) could be applicable to this case. Although § 1964(c) requires a specific violation of § 1962 in order to have a claim for civil relief, nowhere do plaintiffs plead a specific violation of § 1962. Again liberally construing plaintiffs' claims, the only hint as to which violation is most applicable to plaintiffs' claims is found in paragraph 114 which contains the following words: (emphasis added)

> As a direct result of the *"pattern of racketeering activity"* by defendants R & D, Prudential Bache, Gerken, Gamsey, Burns and Keenan, these defendants shared a common purpose of defrauding the plaintiffs and did realize and continue to realize *income* from their wrongful and fraudulent acquisition of Lombart.

In the absence of the words "income," and "pattern of racketeering activity," plaintiffs' alleged RICO claim would be too unspecific under Rule 9(b) to withstand dismissal. The Court finds, however, that this count fails for other reasons.

The existence of the formulaic words described above leads the Court to conclude that the violation of § 1962 most applicable to plaintiffs' claims is § 1962(a), which provides in relevant part:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a) (1988).

To support a RICO claim pursuant to § 1962 plaintiffs must allege (1) the conduct of prohibited activity (2) by an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Marshall–Silver Construction Co. v. Mendel*, 835 F.2d 63, 65 (3d Cir.1987), *rev'd on other grounds*, — U.S. ——, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989). In addition, *Sedima* established that "the plaintiff only has standing if, and can recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." 473 U.S. at 496, 105 S.Ct. at 3285. Defendants argue not only that plaintiffs have failed to properly allege an enterprise, racketeering activity or pattern, but also that plaintiffs lack standing to assert a RICO claim "because [they] have alleged no injury distinct from that to the corporation itself." Def. Mem., 39.

Included within the definition of "racketeering activity" under RICO is "fraud in the sale of securities." 18 U.S.C. § 1961(1)(D). Implicit in that definition is the understanding that securities fraud

alone does not a RICO violation make. Accompanying the securities fraud must be a pattern of racketeering activity. A "pattern of racketeering activity" requires at least two acts of racketeering activity within a 10–year period, the first of which occurred after the enactment's effective date and the last of which occurred within 10 years after the commission of a prior act of racketeering activity. 18 U.S.C. § 1961(5).

The Amended Complaint charges that defendants engaged in a pattern of racketeering consisting of securities fraud (Complt., ¶¶ 112, 113); the direct result of that conduct is that defendants shared a common purpose to defraud and realized income from that fraud and were thus rendered an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Complt., ¶ 114.

The Amended Complaint suffers from more than one fatal error, however, the Court need only address the most obvious: the failure to allege one of the necessary elements needed to state a violation of § 1962—that defendants engaged in "racketeering activity." Plaintiffs sought to satisfy both the "pattern" and "racketeering" elements of RICO by alleging that "the fraud in the sale of securities by defendants ... constitute more than two acts of racketeering activity within a ten (10) year period and thus constitutes a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5). Complt., ¶ 113. Thus the complaint clearly relies on defendants' allegedly "fraudulent" securities transactions with respect to the exchange of warrants and the purchase of VisionTech stock as the predicate acts of "racketeering" that form the "pattern" underpinning plaintiffs' RICO claim. Such allegations of fraud would ordinarily satisfy RICO's "racketeering activity" pleading prerequisite provided there also existed continuity. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Marshall–Silver Construction Co. v. Mendel (M–S II),* 894 F.2d 593 (3d Cir. 1990); *Swistock v. Jones,* 884 F.2d 755, 757–59 (3d Cir.1989).

The Court decided in regard to Counts 5 through 9 that plaintiff's pleadings fail as a matter of law to state a claim that defendants defrauded plaintiffs in violation of § 10(b), Rule 10b–5, or 12(2). All claims of securities fraud will be dismissed from the Amended Complaint. Therefore, since the complaint contains no valid "fraud in the sale of securities," to underpin the "predicate acts" of "racketeering," Count 11 must fail. In other words, the dismissal of the securities fraud claims undercuts the existence of any racketeering activity to support a RICO cause of action, thus Count 11 must be dismissed.

The dismissal of Count 11 will not be with prejudice. The Court is mindful of the Supreme Court's recent decision, *Tafflin v. Levitt,* —— U.S. ——, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990), holding that state courts have concurrent jurisdiction over civil RICO claims, and will not preclude plaintiffs from repleading a RICO claim in state court.

## C. *The Remaining Claims*

In view of the Court's decision that Counts 5 through 9, and Count 11 (the federal claims) cannot withstand defendants' Rule 12(b)(6) motion, it is unnecessary and improvident for the Court to exercise pendent jurisdiction over plaintiffs' state law claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.1976) (without a cognizable claim for relief under the federal securities laws to which the state claims could be appended, the primary justification for the exercise of pendent jurisdiction is absent).

## III. CONCLUSION

For the reasons set forth above, the Court will dismiss Counts 5, 6, 7, 8 and 9 of the Amended Complaint with Prejudice. The Court will also dismiss Count 11 and plaintiffs' state law claims without prejudice.